# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0857
Filed April 1, 2026

———————————

**Dickten Masch Plastics, LLC and Employers Preferred Insurance Company,**
Petitioners–Appellants,

v.

**Debra Lee Stuart,**
Respondent–Appellee.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Jeffrey Farrell, Judge.

———————————

**AFFIRMED**

———————————

Nathan R. McConkey of Huber, Book, Lanz & McConkey, PLLC, West
Des Moines, attorney for appellants.

John P. Dougherty of Lawyer, Dougherty & Palmer, P.L.C., West Des
Moines, attorney for appellee.

———————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

In April 2020, Debra Stuart was laid off from her job at Dickten Masch Plastics, LLC (DMP)—a job created as an accommodation for the disability she suffered during her employment with the firm. In the wake of that disability, she agreed to a 2017 settlement whereby DMP would pay her permanent partial disability benefits. Following her 2020 layoff, she filed a review-reopening petition seeking to increase her disability compensation, arguing the layoff changed her economic condition and that her inability to find any new employment was caused by her initial work injury. Although the workers' compensation commissioner initially denied Stuart's reopening petition, our court reversed that decision on appeal and remanded to the district court with instructions to remand to the commissioner for application of the proper legal standard. *See Stuart v. Dickten Masch Plastics, LLC*, No. 23-0018, 2023 WL 7014183, at *5 (Iowa Ct App. Oct. 25, 2023) [hereinafter *Stuart I*].

On remand, the commissioner ordered DMP to pay Stuart permanent total disability benefits for as long as she is permanently and totally disabled. DMP now appeals from the district court's ruling affirming the commissioner's decision. DMP first argues that the commissioner erred in failing to assess any change in Stuart's earning capacity from the date of the commissioner's original partial disability award and the date of Stuart's review-reopening petition. DMP also contends that the commissioner erred and acted unjustifiably, irrationally, illogically, and abused his discretion in determining that Stuart's job with DMP was an accommodation and that her unemployment was related to her work injury. DMP contends this determination was unsupported by substantial evidence. DMP further sets forth an argument that the commissioner acted unjustifiably, irrationally,

illogically, and abused his discretion without substantial evidence in determining Stuart to be totally disabled.

We affirm, finding no errors of law and that the commissioner's decision was supported by substantial evidence and not wholly unjustifiable, irrational, illogical, or an abuse of discretion.

## BACKGROUND FACTS AND PROCEEDINGS

As discussed above, Stuart filed her review-reopening petition seeking to increase her disability compensation after she was laid off from her position at DMP. Stuart was laid off as a result of her plant's closure. As our court described in Stuart's previous appeal,

> Stuart kept working full-time at [DMP] after her injury. But instead of her previous lead operator role, she worked in a less physically demanding job inspecting light parts. Generally, other employees would bring boxes of the parts to her for inspection while she remained seated. Or she would wheel herself in her chair over to a box and drag it to where she needed it with her cane. [DMP] allowed her—but not other employees—to take breaks to get up and walk around every thirty or forty-five minutes.
>
> According to Stuart, [DMP] created this job for her as an accommodation to her disability. And she said she would not have agreed to the settlement if she could not continue working in the accommodated job. But the settlement agreement included no text addressing her continued employment or accommodation by [DMP].

*Id*. at \*1.

The deputy workers' compensation commissioner later denied Stuart's review-reopening petition, reasoning that any accommodation in Stuart's lost job

> was irrelevant because her 'ability to earn in the competitive job market without regard to the accommodation furnished by one's present employer

was to be taken into account' when she entered into the settlement. Thus, the deputy concluded that 'the facts and circumstances related to her earning capacity remain the same and were known at the time of the original settlement' and Stuart failed to show 'an economic change of condition related to the work injury.' The deputy did not weigh or analyze Stuart's or [DMP]'s other evidence about Stuart's current ability to find a job after her layoff.

*Id.* at *2.

The commissioner affirmed the decision, Stuart applied for judicial review, and the district court affirmed the commissioner. On appeal to this court, we determined the commissioner erred in failing to "make any findings about whether Stuart was being accommodated by [DMP] or whether any accommodation affected the benefits agreed to in the settlement," and in failing to "weigh the competing evidence about Stuart's ability to find work after her layoff to decide whether her current inability to work was proximately caused by her original injury." *Id.* at *4.

We then remanded to the district court with instructions to remand to the commissioner "to apply the correct legal standard to the existing evidentiary record on Stuart's review-reopening petition." *Id.* at *5. On remand, the commissioner found that Stuart had "carried her burden of proof that she had numerous accommodations at [DMP]," the loss of job accommodations was a change in economic conditions, there is not suitable employment available to Stuart, and these findings make her an odd-lot employee [1] and permanently and totally disabled. The commissioner

---

[1] "[A] worker becomes an odd-lot employee when an injury makes the worker incapable of obtaining employment in any well-known branch of the labor market." *Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 105 (Iowa 1985).

4

accordingly awarded Stuart disability benefits for as long as she is totally disabled.

DMP petitioned for judicial review, and the district court affirmed the commissioner's remand decision. DMP now appeals the district court's judicial-review ruling.

## STANDARD OF REVIEW

In workers' compensation cases, we look to Iowa Code chapter 17A (2020) to determine our scope of review. Iowa Code § 86.26 (transferred to section 10A.322, effective July 1, 2023). If the claims on appeal contest the commissioner's fact findings, we determine whether substantial evidence supports those findings. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). Under chapter 17A, evidence is substantial if it is "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). We do not ask if the evidence supports a different finding than that found by the commissioner, but rather, "whether the evidence supports the findings actually made." *Meyer*, 710 N.W.2d at 218 (cleaned up).

When the appellant contests the commissioner's application of the law to the facts, we look for "erroneous interpretation of law; irrational reasoning; failure to consider relevant facts; or irrational, illogical, or wholly unjustifiable application of law to the facts." *Id.* Although we give less discretion to the commissioner's application of law to facts than we do to their fact findings, we still give "some degree of discretion." *See id.* at 218–19 ("[T]he legislature decided that the agency expertness justifies vesting

primary jurisdiction over that matter in the discretion of the agency rather than in the courts."). But we are not bound by that discretion when it is "based on an erroneous interpretation of the law." *See id.* at 219.

## DISCUSSION

### I.     Accommodation and Cause of Unemployment

We begin by addressing DMP's claim contesting the commissioner's determination that Stuart's employment at DMP was an accommodation and that her unemployment at the time she filed her review-reopening petition was caused by her work injury. DMP provides very limited argument in opposition to the commissioner's extensive fact findings supporting his finding that DMP accommodated Stuart and that her work injury was the cause of her continued unemployment.

DMP describes how, when asked during deposition if "there are other people that do what you do [inspecting wire parts]," Stuart testified that "other people do it too." In DMP's view, this is evidence that Stuart's position existed independently of her, and thus, was not a make-work position created to accommodate her injury. But there is a problem with this argument. True, Stuart's terse and nonspecific response does indeed suggest that other people conduct quality control as well. Yet DMP's failure to follow up on Stuart's response provided the commissioner with no details about how quality-control duties are allocated or completed. And relative to Stuart's job creation, her answer just as likely suggests that other people occasionally take part in inspection duties, either in addition to their regular duties or to serve in Stuart's place when she is not on the clock.

6

Indeed, these alternative explanations are supported by the commissioner's express fact findings, which further undermine DMP's position:

> [Stuart] testified the job she was given when she returned to [DMP following her injury] did not exist prior to her return to work. [Stuart] testified she was given a special chair for her work that no one else had at work. [Stuart] testified she took breaks approximately every half hour during the day, and that no other employee at [DMP] was allowed to take so many breaks. [Stuart] testified she got help from coworkers and supervisors to do her job. She testified without her accommodations, she could not have done any job at [DMP].

(Internal citations omitted.)

To the extent that DMP argues Stuart's testimony was found not credible,[2] her statements were corroborated by her former coworker, Karen Knox-Clinton:

> Ms. Knox-Clinton testified she worked with [Stuart] for approximately 5-6 years. Ms. Knox-Clinton stated the job [Stuart] had when she returned to work after her injury did not exist prior to her injury. Ms. Knox-Clinton testified [Stuart] took more breaks than any other employee at [DMP].
>
> [DMP] did not present any evidence that rebuts or disputes any of the testimony of [Stuart] or Ms. Knox-Clinton. Given this record as detailed above, it is found [Stuart] received accommodations at [DMP] following her return to work after her July 19, 2012, injury.

---

[2] The district court concluded, and we agree, that this claim is not accurate. DMP contends the deputy commissioner found "testimony of [Stuart] and her witnesses lacked credibility," but the district court correctly noted that the deputy commissioner only stated "that 'the objective medical evidence in this case does not support the subjective testimony' of Stuart and her sister regarding the alleged worsening of her physical abilities since her injury." Thus, the deputy commissioner's finding on this point does not apply to Stuart's non-medical testimony that DMP now attempts to paint as non-credible.

DMP further sets forth claims that the commissioner incorrectly determined that Stuart's inability to work was related to work injury because, following her layoff, she was applying for jobs she knew she could not physically perform. But Stuart applied to a variety of jobs, at least twenty-five, and acknowledged that she was seeking an employer who would provide her accommodations. And the commissioner made detailed findings describing the efforts she went through and the physical limitations she suffers from which qualify her as an odd-lot employee:

> [Stuart] attempted to find work at 25-30 different employers. Approximately three employers expressed interest in [Stuart] as an employee after seeing her resume. However, those businesses told [Stuart] they did not have a job for her given her restrictions.

> [Stuart] applied for 25-30 jobs after [DMP] closed. [Stuart] was not offered any of those jobs. [Stuart]'s unrebutted testimony is that two or three potential employers called her back after receiving her resume. [Stuart]'s unrebutted testimony is that those employers could not offer [Stuart] work after learning of her restrictions. [Stuart]'s unrebutted testimony is that one potential employer, Casey's, would not even give her a job application given [Stuart]'s physical restrictions.

> Given this record, [Stuart] has carried her burden of proof that she had numerous accommodations at [DMP]. When the plant closed, [Stuart] lost those accommodations. The record indicates [Stuart] has not been able to find work with other potential employers given her permanent restrictions. This record suggests other potential employers are not willing to accommodate [Stuart]'s permanent restrictions.

> Given this record, [Stuart] has carried her burden of proof that she had a change in economic conditions following the loss of job accommodations with the closing of the [DMP] plant.

The commissioner's conclusion that Stuart is an odd-lot employee makes DMP's claim true in a certain sense—she *was* applying for jobs she was not physically capable of performing. But since the commissioner decided that Stuart is "incapable of obtaining employment in any well-known

branch of the labor market," *see Guyton*, 373 N.W.2d at 105, that would make her application to *any* job an application for a job she is not physically capable of performing. And it was within the commissioner's discretion to assign little to no weight to the testimony of DMP's vocational expert, *see Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998), who provided only a very general analysis of the jobs to which Stuart had applied and vaguely opined that she was capable of work in the "unskilled, sedentary category," which Stuart does not dispute. Yet the record shows that Stuart diligently pursued employment in the "unskilled, sedentary category" regardless of her inability to acquire such employment in this market.

## II. Earning Capacity Determination

DMP additionally argues that the commissioner erred in failing to assess any change in Stuart's earning capacity from the date of the commissioner's original partial disability award and the date of Stuart's review-reopening petition.[3] DMP contends that "that the agency, in a review-reopening petition, should not reevaluate an employee's level of physical

---

[3] In this section of its brief, DMP extensively attempts to relitigate the arguments it already unsuccessfully raised before us in *Stuart I* as to the effect of the supreme court's decision in *U.S. West Communications, Inc. v. Overholser*, 566 N.W.2d 873 (Iowa 1997). DMP only slightly narrows its previous claim that "the *Overholser* decision specifically states that a general layoff unrelated to a work injury cannot be the basis for review-reopening." It now argues that a general layoff *following a workers'-compensation-case settlement* cannot be the basis for a review-reopening for loss of earning capacity. As we held in *Stuart I*, the commissioner must look at the full record to determine the proximate cause for the worker's "inability to secure [new] employment." *Stuart I*, 2023 WL 7014183, at *4. Further, our supreme court entertained a review-reopening petition following a case settlement in *Gallardo v. Firestone Tire & Rubber Co.*, 482 N.W.2d 393, 395–97 (Iowa 1992). Neither *Gallardo* nor *Overholser* prohibits review-reopening petitions following general layoffs in settled workers' compensation cases. *See Gallardo*, 482 N.W.2d at 395–96; *Overholser*, 566 N.W.2d at 876–77.

impairment or earning capacity if all of the facts and circumstances were known or knowable at the time of the original action." *See Kohlhaas v. Hog Slat, Inc.*, 777 N.W.2d 387, 393 (Iowa 2009).

But DMP's argument on this point is not accurate; the commissioner did assess the change in earning capacity between the date of the original settlement and the date of the review-reopening petition. DMP argues that "a loss in earnings does not equate to a loss in earning capacity," citing *Hernandez v. Osceola Foods,* No. 12-1658, 2013 WL 1751006, at *3 (Iowa Ct. App. Apr. 24, 2013). It may be true that decreased earnings do not necessarily mean that one's capacity to earn has also decreased, but as explained above, the commissioner expressly found that Stuart is incapable of finding employment that will accommodate her. The commissioner also found that DMP was accommodating Stuart at the time of her injury settlement. It is clear that if Stuart was employed with accommodations in 2020 and, following her layoff, was incapable of finding any employment due to her work injury—accommodated or not—at the time of her review-reopening petition, her earning capacity has thus decreased.

## III. Permanent and Total Disability

On its final claim, DMP presents one new argument not already addressed in its previous claims. DMP argues that Stuart is not permanently and totally disabled because she testified that if she had not been laid off, she "could have continued to work that [accommodated] job if not for the plant's closure." This argument fundamentally misstates what it means to be totally disabled.

Classifying a worker as an odd-lot employee who is totally disabled does not turn on whether that employee is totally incapable of filling any hypothetical position. The odd-lot analysis depends on determining if the

types of work "the worker can perform are 'so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist." *Guyton*, 373 N.W.2d at 105 (citation omitted). As the district court stated:

> Determining if an individual is an odd-lot worker involves consideration of many factors, including "a good faith, unsuccessful effort to find steady employment" as well as "the claimant's physical impairment, intelligence, education, training, ability to be retrained and age." *Second Inj. Fund of Iowa v. Nelson,* 544 N.W.2d 258, 268 (Iowa 1995). "Substantial evidence that these factors show the worker is capable only of odd-lot work can suffice to prove a prima facie case and shift the burden of producing evidence of suitable work to the employer." *Id.*

The commissioner provided ample factual findings explaining why Stuart's physical impairment, intelligence, education, training, ability to be retrained, and age led to his conclusion that Stuart is an odd-lot employee:

> [Stuart] was 63 years old at the time of hearing. [Stuart]went up to the tenth grade in school. [Stuart] does not have a GED. She took special education and remedial classes while in school.
>
> [Stuart] has worked in factory jobs doing grinding. She has worked on assembly lines. [Stuart] has worked in plastic factories operating presses. [Stuart] did some road construction. She testified she could not return to work at any of those jobs given her physical limitations.
>
> [Stuart] does not know how to run a computer. She does not know how to write checks. She was unable to download an application for job searches. [Stuart] has difficulty following instructions on boxed baking items. She said she has difficulty using a tape measure. In the Agreement for Settlement [Stuart] was found to have a 35 percent industrial disability. Testimony of [Stuart], her sister, and Ms. Knox-Clinton is that [Stuart]'s gait is unstable. [Stuart] uses a cane to walk. [Stuart]'s unrebutted testimony is that both physical therapists who performed her [functional capacity evaluations (FCEs)] told her she needed a walker to walk. [Stuart]'s unrebutted testimony is that Dr. Boulden, the employer-retained [independent medical examination] expert, also told her she needed a walker.

11

> [Stuart]'s FCE results placed [Stuart] in the sedentary work category. The FCE results recommended [Stuart] avoid lifting, carrying, pushing or pulling. [Stuart] was also recommended to avoid prolonged standing or sitting.
>
> Dr. Miller, who has provided extended care for claimant, agrees with those permanent restrictions.

(Internal citations omitted.)

The commissioner's findings are reasonable and well-supported by the record. DMP's repeated insistence that we reweigh credibility and place little to no value on the testimony of Stuart, her sister, her former coworker, and medical experts from both parties, while making new factual findings based on the testimony of DMP's vocational expert is not consistent with our standard of review, *see Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 850 (Iowa 2011) ("The commissioner is free to accept or reject an expert's opinion in whole or in part . . . ."), and also not supported by the record.

**AFFIRMED.**